IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Maryann Cyr, | ) | C/A No.: 1:17-798-CMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Nancy A. Berryhill, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a
Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a)
(D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to
obtain judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two
issues before the court are whether the Commissioner's findings of fact are supported by
substantial evidence and whether she applied the proper legal standards. For the reasons
that follow, the undersigned recommends that the Commissioner's decision be reversed
and remanded for further proceedings as set forth herein.

I.     Relevant Background

       A.     Procedural History

       On June 11, 2013, Plaintiff protectively filed an application for DIB in which she
alleged her disability began on March 5, 2013. Tr. at 52 and 116–23. Her application was
denied initially and upon reconsideration. Tr. at 67–70 and 72–73. On June 8, 2015,

Plaintiff had a hearing before Administrative Law Judge ("ALJ") Ann G. Paschall. Tr. at 26–43 (Hr'g Tr.). The ALJ issued an unfavorable decision on July 31, 2015, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 10–25. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–7. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on March 27, 2017. [ECF No. 1].

### B. Plaintiff's Background and Medical History

#### 1. Background

Plaintiff was 56 years old at the time of the hearing. Tr. at 30. She completed high school and some college courses. *Id.* Her past relevant work ("PRW") was as a secretary and an office manager. Tr. at 39. She alleges she has been unable to work since March 5, 2013. Tr. at 116.

#### 2. Medical History

Plaintiff underwent magnetic resonance imaging ("MRI") of the lumbar spine on March 24, 2011, that showed degenerative disc disease at L2-3 to L4-5 with disc narrowing most-pronounced at L3-4. Tr. at 262. It revealed no significant central stenosis. *Id.* However, it indicated mildly prominent extraforaminal zone disc bulging at L2-3 that effaced the fat signal anteriorly adjacent to the L3 nerve root and a small subarticular zone disc protrusion without clear mass effect on any nerve roots at L4-5. *Id.*

On April 5, 2011, orthopedist Gerald Rollins, M.D. ("Dr. Rollins"), noted that the MRI showed degenerative changes and degenerative arthropathy at L2-3 and L3-4 and to

a lesser extent at L4-5. Tr. at 255. He recommended that Plaintiff undergo diagnostic medial branch blocks. Tr. at 256. He indicated he would recommend facet rhizotomy if Plaintiff responded to the medial branch blocks as anticipated. *Id.* He discouraged surgical fusion at L2-3, L3-4, and L4-5 as too aggressive a treatment, but indicated "that is what it would require to get [Plaintiff] improved from a surgical standpoint." *Id.*

On April 15, 2011, James Behr, M.D. ("Dr. Behr"), administered diagnostic bilateral medial branch blocks at L1, L2, L3, and L4. Tr. at 253–54. Dr. Behr subsequently performed bilateral L2, L3, L4, and L5 medial branch radiofrequency ablation (rhizotomy) with fluoroscopic guidance on April 27, 2011. Tr. at 251–52.

On May 18, 2011, Plaintiff reported her back pain had improved following surgery. Tr. at 249 and 250. Dr. Rollins assessed facet arthropathy bilaterally at L2-3, L3-4, and L4-5 with some degenerative changes, but indicated rhizotomy had worked well. *Id.* He instructed Plaintiff to follow up as needed. *Id.*

Plaintiff presented to neurologist Carol A. Kooistra, M.D. ("Dr. Kooistra"), on September 28, 2012. Tr. at 194. Dr. Kooistra indicated that Plaintiff had presented eight months prior for pain in her back and bilateral legs. Tr. at 194. Plaintiff reported that she had been laid off from her job. *Id.* She stated she was considering a job as a school bus driver and requested that Dr. Kooistra perform a physical examination. *Id.* Dr. Kooistra observed Plaintiff to have normal tone, bulk, strength, fine motor movements, sensation, and tandem gait. *Id.* She diagnosed neuralgia, low back pain, and polyneuropathy in diabetes. *Id.* She discussed glucose management and advised Plaintiff to continue her current regimen and to follow up in four months. *Id.*

Plaintiff presented to Oconee Medical Center with a left foot injury on October 18, 2012. Tr. at 231. An x-ray showed mild arthritic changes of the toes, but no fracture or dislocation. Tr. at 240. The attending physician noted decreased range of motion ("ROM") and ecchymosis in Plaintiff's left foot. Tr. at 231–32. He diagnosed a foot sprain and prescribed Hydrocodone-Acetaminophen. Tr. at 232.

Plaintiff reported her pain as a 10 on a 10-point scale on March 26, 2013. Tr. at 192. She complained of a recent onset of pain in the greater trochanteric region of her left lateral hip. *Id.* She indicated her medications had allowed her to function better, but that she continued to experience significant low back pain at times. *Id.* Dr. Kooistra observed signs of pain with ROM of Plaintiff's left hip and tenderness in her greater trochanteric region. *Id.* She noted Plaintiff had normal tone, bulk, strength, fine motor movements, sensation, and tandem gait. *Id.* She assessed low back pain, polyneuropathy in diabetes, and bursitis. *Id.* She prescribed Nucynta and administered a trigger point injection. *Id.*

Plaintiff reported increased pain in her low back and hip and rated her pain as a 10 on August 27, 2013. Tr. at 208. Dr. Kooistra observed Plaintiff to have signs of pain with ROM of the left hip and tenderness to the greater trochanteric region. *Id.* She assessed low back pain and bursitis, prescribed Nucynta and Flexeril, and administered a trigger point injection to Plaintiff's left greater trochanteric region. *Id.*

Plaintiff presented to Husam Mourtada, M.D. ("Dr. Mourtada"), for a consultative examination on September 10, 2013. Tr. at 215. Dr. Mourtada observed Plaintiff to have 5/5 motor strength in her upper extremities and right lower extremity and 4/5 strength in her left lower extremity. Tr. at 216. A straight-leg raising ("SLR") test was negative. *Id.*

Plaintiff demonstrated no focal or sensory deficits. *Id.* Her deep tendon reflexes were reduced at 1+/4. *Id.* She was tender to palpation across her lower lumbar spine. *Id.* Her cervical ROM was reduced to 45 degrees of flexion, 45 degrees of extension, and 30 degrees of lateral flexion.[1] Tr. at 213. Her lumbar ROM was reduced to 65 degrees of flexion, 15 degrees of extension, and 15 degrees of lateral flexion.[2] *Id.* She demonstrated no motor atrophy and normal gait. Tr. at 216. She was able to squat and to perform tandem, heel, and toe walking. *Id.* An x-ray of Plaintiff's lumbar spine showed degenerative disc disease at L2-3 and L3-4 and subtle atherosclerosis of the abdominal aorta and iliac arteries. Tr. at 211. Dr. Mourtada assessed hypertension, hyperlipidemia, and chronic low back pain. Tr. at 216. He found that Plaintiff was able to independently manage her funds. Tr. at 217.

On September 25, 2013, state agency medical consultant Dale Van Slooten ("Dr. Van Slooten"), reviewed the record and completed a physical residual functional capacity ("RFC") assessment. Tr. at 50. He indicated Plaintiff had the following limitations: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for a total of about six hours in eight-hour workday; sit for a total of about six hours in an eight-hour workday; frequently balance, kneel, crouch, crawl, and climb ramps and stairs; occasionally stoop and climb ladders, ropes, and scaffolds. *Id.*

---

[1] Normal ROM of the cervical spine is to 50 degrees of flexion, 60 degrees of extension, and 45 degrees of lateral flexion. Tr. at 213.

[2] Normal ROM of the lumbar spine is to 90 degrees of flexion, 25 degrees of extension, and 25 degrees of lateral flexion. Tr. at 213.

A second state agency medical consultant, William Hopkins, M.D. ("Dr. Hopkins"), reviewed the record and completed a physical RFC assessment on December 11, 2013. Tr. at 59–60. He indicated Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; frequently balancing, kneeling, crouching, crawling, and climbing ramps and stairs; and occasionally stooping and climbing ladders, ropes, and scaffolds. *Id.*

On February 14, 2014, Plaintiff reported that she had been unable to afford an MRI of her lumbar spine. Tr. at 223. She indicated her last injection had provided a month of relief, but had worn off. *Id.* She continued to complain of pain in her low back and left hip and rated her pain as a nine. *Id.* Dr. Kooistra observed Plaintiff to show signs of left hip pain on ROM testing and to have reduced reflexes. *Id.* She noted that Plaintiff demonstrated normal tone, bulk, strength, fine motor movements, sensation, and tandem gait. *Id.* She instructed Plaintiff to continue her current medication regimen. *Id.*

Plaintiff presented to Mary Black Memorial Healthcare System for increased left elbow pain on February 15, 2014. Tr. at 269. The attending physician observed Plaintiff to have decreased ROM to extremes of supination and pronation in her left elbow. Tr. at 272. He diagnosed a left elbow sprain and instructed Plaintiff to take 600 mg of ibuprofen. *Id.*

Plaintiff presented to After Hours Family Practice for medication refills on March 29, 2014. Tr. at 228. She reported left elbow pain. *Id.* Her blood pressure was elevated at

164/84 mm/Hg. *Id.* The provider prescribed Hydrochlorothiazide and Mobic and instructed Plaintiff to follow up in six months. *Id.*

On June 26, 2014, Plaintiff reported that her low back and hip pain had increased even though she had been engaging in aquatic therapy. Tr. at 221. She indicated Nucynta no longer provided adequate relief and Flexeril provided relief at night, but was too sedating for her to use during the day. *Id.* Dr. Kooistra observed Plaintiff to have normal tone, bulk, strength, fine motor movements, sensation, and tandem gait. *Id.* She noted trace+ and symmetric reflexes. *Id.* She prescribed an extended-release Butrans patch. *Id.*

On August 13, 2014, Plaintiff presented to Oconee Medical Center with shoulder pain. Tr. at 237. The attending physician observed tenderness in Plaintiff's left superior deltoid, pain with abduction, little pain with rotation, and no swelling or erythema. Tr. at 238. He diagnosed subdeltoid bursitis and prescribed Percocet and Prednisone. Tr. at 230. An x-ray of Plaintiff's left shoulder showed no evidence of acute fracture or dislocation and unremarkable acromioclavicular ("AC") and glenohumeral joints. Tr. at 229.

Plaintiff presented to After Hours Family Practice on September 24, 2014, for medication refills. Tr. at 227. Her blood pressure was controlled. *Id.* The provider prescribed Mobic, Hydrochlorothiazide, and Lovastatin. *Id.*

On September 25, 2014, Plaintiff reported her pain was generally well-tolerated, but complained of some mid-day breakthrough pain. Tr. at 244. She rated her pain as an eight. *Id.* She also endorsed right shoulder pain with motion. *Id.* Dr. Kooistra noted that Plaintiff was "continuing to work." *Id.* She observed Plaintiff to have trace+ and symmetric reflexes and normal tone, bulk, strength, fine motor movements, sensation,

and tandem gait. *Id.* She noted evidence of pain over Plaintiff's AC joint with abduction and a positive impingement sign. *Id.* She diagnosed neuralgia and shoulder pain and increased Plaintiff's dosage of Norco 10/325 mg to three times a day. *Id.*

On January 5, 2015, Plaintiff returned to After Hours Family Practice for medication refills. Tr. at 227. She noted that she had been out of Hydrochlorothiazide for two days, and her blood pressure was elevated at 168/90 mm/Hg. *Id.*

On March 19, 2015, Dr. Kooistra noted that Plaintiff's last urine drug screen showed evidence of Oxycodone and its metabolites, alcohol, and tetrahydrocannabinol ("THC"). Tr. at 242. Plaintiff denied use of alcohol and Oxycodone, but indicated she had tried marijuana once for pain management. *Id.* Dr. Kooistra indicated she would continue to prescribe Norco 10/325 mg because of Plaintiff's history of compliance with her medications. *Id.* She observed Plaintiff to demonstrate normal tone, bulk, strength, fine motor movements, sensation, and tandem gait and trace+ and symmetric reflexes. *Id.*

Plaintiff presented to After Hours Family Practice for medication refills and lab work on April 20, 2015. Tr. at 280. She complained of chronic pain in her back and hips and indicated she had stopped taking Mobic. *Id.* Her provider increased Plaintiff's dose of Lovastatin and prescribed Metformin and Adipex. *Id.*

Plaintiff presented to After Hours Family Practice for a blood pressure check on April 29, 2015. Tr. at 279. Her blood pressure was elevated at 152/80. *Id.* She complained of a headache and edema in her bilateral lower legs. *Id.* She indicated she was taking Hydrochlorothiazide and requested a prescription for Lasix. *Id.* The provider

denied her request, but increased her dose of Hydrochlorothiazide and added a prescription for Lisinopril. *Id.*

On May 8, 2015, an MRI of Plaintiff's lumbar spine showed a mild diffuse posterior disc bulge with no definite impingement upon the exiting or traversing nerve roots at L2-3; neural foraminal narrowing as a result of a broad-based posterior disc protrusion and facet spurring at L3-4; and a broad-based posterior disc protrusion without definite impingement upon the exiting or traversing nerve roots at L4-5. Tr. at 282. An MRI of Plaintiff's pelvis revealed reactive marrow change on either side of the interior aspect of her right sacroiliac joint that was consistent with either degenerative change within the right sacroiliac joint or early sacroiliitis. Tr. at 285. It also showed degenerative disc signal at multiple levels of the lower lumbar spine and mild degenerative change of the pubic symphysis. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on June 8, 2015, Plaintiff testified that she had stopped working because her back pain had worsened to the point that she could no longer sit or stand for more than 10 to 15 minutes at a time. Tr. at 32. She described the pain as radiating from her low back to her bilateral hips and being worse in the left hip. Tr. at 33. She also endorsed pain in her left shoulder that was exacerbated by lifting and "sleep[ing] on it the wrong way." Tr. at 33–34. She stated she had been diagnosed with diabetes and had neuropathy in her hands and feet. Tr. at 34–35.

Plaintiff testified that the neuropathy in her hands prevented her from using them for extended periods. Tr. at 35. She indicated she could sit, stand, and walk for 10 to 15 minutes each. Tr. at 37. She claimed that she needed to walk for 15 minutes after sitting for 10 to 15 minutes. *Id.* She stated the heaviest item she could lift without pain was a gallon of milk. Tr. at 34. She claimed that Flexeril caused her to feel tired. Tr. at 37. She indicated she had difficulty focusing on television shows because of her pain and tiredness. Tr. at 38. She stated she was most comfortable when lying down. *Id.* She estimated that she would typically lie down for four hours per day, but would lie down for a longer period on rainy days. *Id.*

Plaintiff testified that she lived with her husband. Tr. at 31. She stated she was able to drive. *Id.* She indicated she had difficulty bending to put on her shoes and socks. Tr. at 34. She stated she washed dishes, vacuumed, and prepared meals, but had to take frequent breaks. Tr. at 35–36. She testified that her husband cleaned the bathrooms because she could no longer bend over the bathtub. Tr. at 36.

b.      Vocational Expert Testimony

Vocational Expert ("VE") Karl Weldon reviewed the record and testified at the hearing. Tr. at 39–42. The VE categorized Plaintiff's PRW as a secretary, *Dictionary of Occupational Titles* ("*DOT*") number 201.362-030, as sedentary with a specific vocational preparation ("SVP") of six and an office manager, *DOT* number 169.167-034, as sedentary with an SVP of seven. Tr. at 39. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could perform light work that required her to lift 20 pounds occasionally and 10 pounds frequently; sit, stand, or walk for up to six

hours each in an eight-hour workday; avoid use of ladders; avoid exposure to dangerous machinery or unprotected heights; occasionally stoop; and frequently climb stairs, balance, kneel, crouch, crawl, and engage in bilateral handling and fingering. Tr. at 39–40. The VE testified that the hypothetical individual could perform Plaintiff's PRW. Tr. at 40.

The ALJ asked the VE to consider that the hypothetical individual would be unable to maintain attention and focus and would be limited to simple, repetitive tasks and instructions as a result of chronic pain and side effects from medication. *Id.* The VE stated that Plaintiff's PRW would not allow for those restrictions. *Id.* The ALJ asked the VE to identify other jobs that could be performed with the restrictions in the first hypothetical question and a restriction to simple, repetitive tasks and instructions. *Id.* The VE identified light jobs with an SVP of two as a hand packager, *DOT* number 753.687-038, with 798,000 positions in the economy and a mail clerk, *DOT* number 209.687-026, with 234,000 positions in the economy. *Id.*

The ALJ asked the VE to consider that the individual would need to change positions as often as every 30 minutes as a result of back pain. Tr. at 41. He asked if the individual could perform Plaintiff's PRW or the identified jobs. *Id.* The VE responded that the individual would be unable to perform Plaintiff's PRW or the job as a mail clerk. *Id.* He stated the individual could perform the job as a hand packager, but the number of positions would be reduced by approximately 30 percent. *Id.*

The ALJ asked the VE to consider that the individual would need to change positions every 15 minutes. *Id.* The VE stated the hand packager position could not be performed with the additional restriction. *Id.*

The ALJ asked the VE to consider the restrictions in the second hypothetical question, but to assume that the individual would be unable to maintain attention and focus or stay on task for as much as two hours at a time or would require excessive breaks because of chronic pain. *Id.* She asked if any of the jobs identified would allow for that restriction. *Id.* The VE testified that they would not. *Id.*

The ALJ asked the VE to consider that the individual would be unable to consistently work eight hours per day, five days per week, or would miss three or more days of work per month. Tr. at 42. She asked if the identified jobs or any other jobs would be available. *Id.* The VE stated they would not. *Id.*

2.      The ALJ's Findings

In his decision dated July 31, 2015, the ALJ made the following findings of fact and conclusions of law:

1.      The claimant last met the insured status requirements of the Social Security Act on December 31, 2015.
2.      The claimant did not engage in substantial gainful activity during the period from her alleged onset date of March 5, 2013 through the date of this decision (20 CFR 404.1571 *et seq.*).
3.      Through the date last insured, the claimant has the following severe impairments: lumbar degenerative disc disease, right hip degenerative joint disease, type II diabetes with neuropathy, mild degenerative joint disease of the toes and obesity (20 CFR 404.1520(c)).
4.      Through the date of this decision, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, I find that, through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). She can lift 10 pounds frequently and 20 pounds occasionally. She can sit, stand and walk for six hours each in an eight hour workday. The claimant can never use ladders. Ms. Cyr should have no exposure to dangerous machinery or unprotected heights. She can occasionally stoop, and frequently balance, climb stairs, crawl, kneel and crouch. She can frequently engage in bilateral handling and fingering.

6.     Through the date of this decision, the claimant is capable of performing past relevant work as a secretary and office manager. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.     The claimant is not under a disability, as defined in the Social Security Act, at any time from March 5, 2013, the alleged onset date, through the date of this decision (20 CFR 404.1520(f)).

Tr. at 15–20.

## II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     the ALJ did not cite specific reasons to support her assessment of Plaintiff's credibility; and

2)     the ALJ did not adequately evaluate the demands of Plaintiff's PRW.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

### A.    Legal Framework

#### 1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

13

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The

scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Credibility Assessment

Plaintiff argues the ALJ erred in finding her allegations to be less than credible because they were inconsistent with the RFC assessment. [ECF No. 10 at 14]. She

maintains the ALJ determined her ability to work before evaluating her credibility. *Id.* at 15. She contends the ALJ failed to explain how her subjective reports were inconsistent with the medical evidence. *Id.* at 15. She claims the ALJ neglected factors in addition to the objective evidence that were relevant to the credibility assessment, including her need for strong pain medications and frequent changes of position. *Id.* at 17–18, citing 20 C.F.R. § 404.1529(c) and SSR 96-7p. She contends that the ALJ's credibility analysis was similar to the analysis the court considered erroneous in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), in that the ALJ provided no explanation for finding some, but not all, of her statements to be credible. [ECF No. 12 at 3].

The Commissioner acknowledges that the ALJ used boilerplate language that the court criticized in *Mascio*, but argues that the ALJ's error was harmless because she properly weighed Plaintiff's subjective statements. [ECF No. 11 at 7]. She maintains that the ALJ considered Plaintiff's complaints and credited them in identifying specific limitations. *Id.* at 7–8.

Pursuant to SSR 96-7p, after finding that a claimant has a medically-determinable impairment that could reasonably be expected to produce her alleged symptoms, an ALJ should evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the restrictions they impose on her ability to do basic work activities. If the objective medical evidence does not substantiate the claimant's statements about the intensity, persistence, or limiting effects of her symptoms, the ALJ is required to consider the credibility of the statements in light of the entire case record. SSR 96-7p. The ALJ must consider "the medical signs and laboratory findings, the individual's own statements

about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." *Id.*; 20 C.F.R. § 404.1529(a) (effective June 13, 2011 to March 26, 2017). In addition to the objective medical evidence, the ALJ should consider the claimant's activities of daily living ("ADLs"); the location, duration, frequency, and intensity of her pain or other symptoms; factors that precipitate and aggravate her symptoms; the type, dosage, effectiveness, and side effects of her medications; treatment, other than medication, she receives or has received; any measures other than treatment and medications she uses or has used to relieve her pain or other symptoms; and any other relevant factors concerning her limitations and restrictions. *Id.*; 20 C.F.R. § 404.1529(c) (effective June 13, 2011 to March 26, 2017).

The ALJ should "consider whether there are any inconsistencies in the evidence and the extent to which there are conflicts between the claimant's statements and the additional evidence of record. 20 C.F.R. § 404.1529(c) (4) (effective June 13, 2011 to March 26, 2017). The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p.

In the instant case, the ALJ stated as follows:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

Tr. at 18.

The Fourth Circuit recently considered the same language in *Mascio*, 780 F.3d at 639, and found that the ALJ erred in determining the plaintiff's RFC before assessing her credibility. It agreed with the Seventh Circuit that the language "gets things backwards" by implying "that ability to work is determined first and is then used to determine the claimant's credibility." *Id.*, citing *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012); 20 C.F.R. § 404.1529(a); SSR 96-8p. The court acknowledged that an ALJ's use of the erroneous language may be deemed harmless if a review of her decision were to reveal that she properly analyzed credibility elsewhere. *Id.* It clarified that the ALJ must compare a claimant's alleged functional limitations from pain to the other evidence in the record and consider her pain in analyzing her RFC. *Id.* It found that the ALJ erred in failing to explain how he decided which of the plaintiff's statements to believe and which to discredit and that his lack of explanation required remand. *Id.* at 640.

In this case, an overview of the ALJ's decision reveals that she cited Plaintiff's statements about the location, duration, frequency, and intensity of her pain and other symptoms; most of the medical signs and laboratory findings of record; statements from medical sources; her ADLs; factors that precipitated and aggravated her symptoms; her

medications and their side effects; the type of treatment she had received; and the methods she used to reduce her pain or other symptoms as required by 20 C.F.R. § 404.1529 and SSR 96-7p. *See* Tr. at 18–20.

The ALJ noted Plaintiff's testimony that she had stopped working because her back pain would not allow her to stand for longer than 10 to 15 minutes; that she could walk for 15 minutes before she needed to rest; that her pain radiated from her low back to her hips; that she experienced left shoulder pain if she slept the wrong way or attempted to lift; that she could lift a gallon of milk with both hands; and that she had difficulty bending to put on her shoes and socks. Tr. at 17–18. She cited Plaintiff's testimony that diabetic neuropathy caused her hands to "fall asleep and tingle" and prevented her "from doing things [requiring her hands] for a long period." Tr. at 18. She noted that Plaintiff's ADLs included participating in water therapy, watching television, and performing some household chores. *Id.* She acknowledged that Plaintiff had testified that it took her "a long time to do anything." *Id.* She indicated Plaintiff had claimed she felt most comfortable when lying down and spent four hours lying down each day. *Id.* She noted Plaintiff reported that Flexeril made her feel tired and that her pain affected her ability to concentrate. *Id.*

The ALJ cited the treating and examining physicians' observations that Plaintiff had normal tone, bulk, and strength; normal and symmetric fine motor movements; intact sensation to pinprick, vibration, and proprioception throughout; normal tandem gait; 5/5 motor strength in the bilateral upper extremities and right lower extremity; 4/5 strength in the left lower extremity; negative SLR bilaterally; no focal or sensory deficits; 1+/4 deep

tendon reflexes; intact cranial nerves; tenderness to palpation across the lower lumbar spine; reduced ROM of the lumbar and cervical spine; normal ROM of the shoulders, elbows, wrists, knees, hips, and ankles; abilities to tandem walk, heel walk, toe walk, and squat; an absence of motor atrophy; and an elevated hemoglobin A1c level. Tr. at 18–19. She noted that Plaintiff had received trigger point injections and had been prescribed medications. Tr. at 18. She cited x-rays and MRI reports that showed degenerative disc disease, mild multilevel spondylosis, mild diffuse posterior disc bulging at L2-3, broad-based posterior disc protrusion at L3-4 and L4-5; reactive marrow change of the interior aspect of the right sacroiliac joint; mild degenerative change of the pubic symphysis; and mild degenerative changes in her toes. Tr. at 18–19. She gave some weight to Dr. Van Slooten's opinion, great weight to Dr. Hopkins's opinion, and great weight to Dr. Mourtada's report. Tr. at 19–20.

The ALJ provided a reason for each limitation she included in the RFC assessment. She indicated the objective findings and Plaintiff's testimony regarding her pain "form[ed] part of the basis for the limitation to light work with only occasional stooping." Tr. at 18–19. She stated the medical records did not suggest Plaintiff's "hip impairment presented any physical limitations, other than pain with left hip range of motion (5F/3) distinct from the physical limitations attributed to her back impairment" and "account[ed] for the hip impairment by limiting her to light work with postural limitations." Tr. at 19. She limited Plaintiff's "exposure to dangerous machinery and unprotected heights as well as no use of ladders to account for any possible unsteadiness resulting from the neuropathy in her feet" and "limited her to frequent bilateral handling

and fingering based primarily on her testimony regarding neuropathy in her hands." *Id.* She also prohibited Plaintiff from being exposed to dangerous machinery or unprotected heights based on her report that "Flexeril was too sedating during the day." *Id.*

Despite the ALJ's recognition of Plaintiff's allegations and her explanation for the restrictions she imposed, her decision is devoid of any reason as to why she declined to credit Plaintiff's additional alleged restrictions. As the ALJ acknowledged in her recitation of the evidence, Plaintiff's testimony supports additional restrictions including an inability to sit, stand, or walk for longer than 10 to 15 minutes at a time as a result of pain in her back and hips and impaired concentration and a need to lie down for four hours each day as a result of pain and side effects from medication. *See* Tr. at 18–19. While the ALJ was not required to credit these allegations, she was required to explain how she determined which of Plaintiff's statements to believe and which to reject. *Mascio*, 780 F.3d at 640.

The ALJ's failure to incorporate additional restrictions in the RFC assessment to accommodate these alleged limitations allows the court to reasonably conclude that she did not credit them, but we are "left to guess about how the ALJ arrived at [her] conclusions." *See id.* at 637. She cited evidence of both normal and abnormal findings and conceded that Plaintiff's impairments "could reasonably be expected to cause some of the alleged limitations." *See* Tr. at 18–20. In the absence of an explanation from the ALJ as to why she found that the evidence did not support the additional restrictions Plaintiff alleged, the undersigned recommends the court remand the case for reconsideration of Plaintiff's credibility.

### 2. PRW

Plaintiff argues the ALJ erred in concluding that she could perform her PRW without obtaining detailed information as to its requirements. [ECF No. 10 at 19]. She maintains the ALJ did not set out the physical and mental requirements of her PRW and compare them to her RFC as required by SSR 82-62. *Id.* at 19–20. She contends that her work history report reflected job duties that exceeded the exertional limitations in the RFC assessment. *Id.* at 20. Plaintiff maintains that the ALJ also failed to develop the record to determine if she could perform her PRW as generally performed. [ECF No. 12 at 7]. She claims that the evaluation of her PRW is critical because Medical-Vocational Guideline 202.06 would direct a finding that she was disabled based on her age, education, and a maximum sustained work capability limited to light work if she were unable to perform her PRW. [ECF No. 10 at 21].[5]

The Commissioner argues that a finding of "not disabled" is directed if either the claimant can return to her PRW as actually performed or as generally performed in the economy. [ECF No. 11 at 9]. She maintains that the assessed RFC would allow Plaintiff to perform her PRW as generally performed. *Id.* at 9–10. She contends that there was no discrepancy between the assessed RFC and Plaintiff's PRW as generally performed. *Id.* at 10.

---

[5] The undersigned notes that Medical-Vocational Guideline 202.06 would only direct a finding of "disabled" if Plaintiff's RFC would not allow for performance of her PRW and if she lacked transferable skills to other jobs that her RFC would allow her to perform. *See* 20 C.F.R. Part 404, Subpart P, App'x 2, § 202.06. In the absence of information regarding transferable skills from Plaintiff's PRW, the undersigned declines to address this issue.

A claimant will generally be found "not disabled" if her RFC allows her to meet the physical and mental demands of PRW as actually performed or as described by the *DOT* as customarily performed throughout the economy. SSR 82-62. "Past work experience must be considered carefully to assure that the available facts support a conclusion regarding the claimant's ability or inability to perform the functional activities required in this work." *Id.*

Pursuant to SSR 82-62, "[a]dequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations" and "[d]etailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate." This information may be gleaned from "a detailed description of the work obtained from the claimant, employer, or other informed source." *Id.* Because a determination as to whether a claimant can perform PRW is important and sometimes even controlling, it is important that the ALJ make every effort "to secure evidence that resolves the issue as clearly and explicitly as circumstances permit." *Id.*

The ALJ must make the following specific findings of fact to support a determination that the claimant can perform PRW: (1) a finding of fact as to the claimant's RFC; (2) a finding of fact as to the physical and mental demands of PRW; and (3) a finding of fact that the individual's RFC would permit a return to her PRW. *Id.*

In this case, the ALJ made a finding of fact as to Plaintiff's RFC. Tr. at 17. She also made a finding of fact as to the physical and mental demands of Plaintiff's PRW to the extent that she cited the *DOT* numbers and exertional and skill levels the VE

indicated in his testimony for Plaintiff's PRW as a secretary and office manager. Tr. at 20. She determined that Plaintiff's RFC would permit a return to her PRW, stating the work did "not require the performance of work-related activities precluded by the claimant's residual functional capacity." *Id.* She concluded "[i]n comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform these jobs as actually and generally performed." *Id.*

A review of Plaintiff's work history report supports her argument that the RFC the ALJ assessed would not allow her to perform her PRW as a secretary and office manager as actually performed because both jobs required that she lift in excess of 20 pounds and her job as an office manager at Greer Relief required that she engage in constant handling and fingering.[6] *Compare* Tr. at 17 (setting forth Plaintiff's RFC), *with* Tr. at 143–52 (describing Plaintiff's PRW). However, even if the ALJ erred in concluding that Plaintiff could perform her PRW as actually performed, substantial evidence supports her decision if Plaintiff could perform her PRW as described in the *DOT* as being customarily performed throughout the economy. *See* SSR 82-62.

A review of the *DOT*'s descriptions of the jobs of secretary and office manager indicates no conflict with the restrictions in the RFC assessment. *Compare* Tr. at 17 (restricting Plaintiff to work at the light exertional level with no use of ladders or exposure to dangerous machinery or unprotected heights, occasional stooping, and

---

[6] Plaintiff did not specify how frequently she engaged in handling and fingering in her job as a secretary. Tr. at 147.

frequent balancing, stair climbing, crawling, kneeling, crouching, and bilateral handling and fingering), *with* 201.362-030, SECRETARY. *DOT* (4th ed., revised 1991), 1991 WL 671672 *and* 169.167-034, MANAGER, OFFICE. *DOT* (4th ed., revised 1991), 1991 WL 647430 (identifying the jobs as requiring sedentary exertion, no climbing, no exposure to high exposed places or moving mechanical parts, no stooping, no crouching, no crawling, no kneeling, no balancing, and frequent handling and fingering).

Plaintiff maintains that substantial evidence does not support the ALJ's reliance on the jobs of office manager and secretary as generally described in the *DOT* because the VE did not specifically testify that the RFC would allow for performance of her PRW as generally performed. [ECF No. 12 at 5–6]. The undersigned rejects Plaintiff's argument and her reliance on the non-binding cases of *Thammasuvimol v. Commissioner, Social Security Administration*, No. SAG-11-3321, 2013 WL 1820086 (D. Md. Apr. 29, 2013) and *Timmons v. Colvin*, No. 3:12-609, 2013 WL 4775131, at *5 (W.D.N.C. Sept. 5, 2013), for several reasons.

The instant case differs from *Timmons* in that Plaintiff has not alleged that her job duties varied significantly from the *DOT*'s description of her PRW.[7] Her description of her PRW is similar to that described in the *DOT*, except that she described her PRW as requiring she rarely lift more than 10 pounds and engage in handling and fingering on more than a frequent basis. *Compare* Tr. at 143–52, *with* 201.362-030, SECRETARY. *DOT* (4th ed., revised 1991), 1991 WL 671672 *and* 169.167-034, MANAGER, OFFICE.

---

[7] In *Timmons*, 2013 WL 4775131, at *5, the plaintiff alleged that her PRW as a short order cook was a composite job.

*DOT* (4th ed., revised 1991), 1991 WL 647430. Plaintiff's ability to lift greater weight and engage in constant handling and fingering suggests she could have also lifted less weight and engaged frequent handling and fingering in the vocationally-relevant past.

In contrast to the ALJ in *Thammasuvimol* who relied strictly on written function reports to conclude that the plaintiff was able to perform PRW as generally performed, the ALJ in the instant case relied on a record that included Plaintiff's testimony and function reports. *See* Tr. at 31–32 and 143–52. Although the questions the ALJ directed to Plaintiff during the hearing primarily concerned the exertional requirements of her PRW, Plaintiff has pointed to no particular questions that the ALJ failed to pose regarding work demands that had "a bearing on the medically established limitations." SSR 82-62. Thus, she has failed to allege that the ALJ neglected to obtain information about the demands of her PRW that would have been relevant to an inquiry as to whether her RFC would allow her to perform it.

This case also differs from *Thammasuvimol* and *Timmons* in that the ALJ obtained testimony from a VE. *See* Tr. at 39–40. The following exchange occurred between the ALJ and the VE:

> [ALJ:]  Mr. Weldon, Ms. Cyr has told us about past work as a secretary, and then a couple of different office manager positions. Are you able to classify those jobs for me in terms of exertional and skill levels?
>
> [VE:]  I am, your honor.
>
> [ALJ:]  Would you do that, please?
>
> [VE:]  Yes, ma'am. Her work as a secretary, she told us, was sedentary work. It is a skilled job, SVP of 6, *DOT* number

|  | 201.362-030. I believe the office manager positions she described were sedentary jobs, and were also skilled, SVP of 7, *DOT* number 169.167-034. |
|---|---|
| [ALJ:] | All right. And if this individual, or someone of Ms. Cyr's age, education, and experience was limited to a maximum of light work as we customarily define that, and that's lifting 10 pounds frequently, 20 pounds occasionally, sit, stand, or walk up to six hours each in an eight hour day, with no use of ladders, no exposure to dangerous machinery or unprotected heights, occasional stooping, frequent balancing, climbing stairs, crouching, kneeling, and crawling, and frequent bilateral handling and fingering; would any of the past work be available? |
| [VE:] | I believe that the [sic] she could perform her work as an office manager, and as a secretary, your honor. |

Tr. at 39–40. While the VE did not state that the RFC would allow for performance of Plaintiff's PRW as generally performed, his identification of *DOT* numbers for the jobs and his failure to indicate any deviation from the *DOT* for the jobs as generally performed can reasonably be interpreted to suggest that the RFC would allow for performance of the jobs.

Although VE testimony is sometimes needed to address how certain restrictions affect claimants' abilities to perform specific jobs, 20 C.F.R. § 404.1566(e), the *DOT* is the primary source "for information about the requirements of work in the national economy." 20 C.F.R. § 404.1566(d); SSR 00-4p. In the absence of specific arguments from Plaintiff that her RFC did not allow for performance of her PRW as generally performed or that she lacked skills to perform her PRW as generally performed, the ALJ was permitted to reasonably rely on the *DOT*'s description as a primary source for job information.

For the aforementioned reasons, the undersigned would generally be compelled to recommend the court reject Plaintiff's argument that the ALJ erred in finding that the assessed RFC would allow her to perform her PRW as generally performed. However, the undersigned finds the ALJ's analysis of Plaintiff's PRW to be troublesome in light of the record in this case and the following direction in SSR 82-62:

> Determination of the claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental demands of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy.

Plaintiff specifically testified that she had stopped working because her back pain prevented her from sitting or standing for more than 10 to 15 minutes at a time. Tr. at 32. She also claimed that she was unable to use her hands for long periods because of diabetic neuropathy; that her ability to concentrate was impaired by her medication; and that she needed to lie down for four hours each day because of pain and side effects of medication. Tr. at 35 and 38. Thus, Plaintiff alleged she was unable to perform her PRW because she would need to frequently alternate between sitting, standing, and walking; would have to rest for four hours during the workday; would have impaired concentration that might affect her ability to perform skilled work; and would be unable to engage in frequent handling and fingering. The ALJ was not required to accept Plaintiff's statements, but, as discussed above, she erred in failing to explain her reasons for rejecting them. Therefore, the undersigned recommends the court find the ALJ's decision

does not comply with the provisions of SSR 82-62 in that it lacks "a careful appraisal" of Plaintiff's statements as to which PRW requirements she could no longer meet and the reasons for her inability to meet those requirements.

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

December 12, 2017                              Shiva V. Hodges
Columbia, South Carolina               United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).